## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SIERRA CLUB and** | ) | Civil Action No. 2:08cv00036 |
| **SOUTHERN APPALACHIAN** | ) | |
| **MOUNTAIN STEWARDS, INC.,** | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Plaintiffs, | ) | |
| | ) | |
| **v.** | ) | BY: PAMELA MEADE SARGENT |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| **DIRK KEMPTHORNE, et al.** | ) | |

Defendants.

To a child of Appalachia, to see the mountains laid waste, whether by clear – cutting or strip mining, is to witness a dagger plunged into the very bosom from which you sprang and which has sustained you. Nonetheless, this court's role in this case is not to pass judgment upon the policy decisions which allow such activities. Instead, its role is to decide the issue presented in this case – whether the court should issue a permanent injunction preventing continued logging activities on this property without a valid surface mining permit. For the reasons outlined below, I find that it should not, and I further recommend that the court vacate the preliminary injunction entered on August 4, 2008.

### I. Background

The plaintiffs, Sierra Club and Southern Appalachian Mountain Stewards, Inc., ("SAMS"), brought this action against the defendant, Dirk Kempthorne, the Secretary of the Interior, seeking an order compelling Kempthorne to issue a cessation order

-1-

requiring Penn Virginia Operating Company, LLC, ("Penn Virginia"), Mountain Forest Products, LLC, ("MFP"), and any others acting in concert with them to cease removing vegetation, constructing or improving roadways or conducting any other "surface coal mining operations," as that term is defined by statute and regulation, on land within the proposed permit boundaries delineated in Permit Application No. 1003841, which is pending before the Virginia Department of Mines, Minerals & Energy, ("DMME"). (Docket Item No. 1). In their Complaint, the plaintiffs allege that the defendants have violated the terms of the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201 et seq, ("SMCRA"). Thereafter, the plaintiffs filed a motion, which this court construed as a motion for a preliminary injunction, seeking the same relief. (Docket Item No. 10.)

Following a hearing on August 1, 2008, the undersigned issued a Report and Recommendation, recommending that the court grant the preliminary injunction and ordering the Secretary of the Interior to issue a cessation order. (Docket Item No. 17.) On August 3, 2008, MFP and Penn Virginia moved to intervene. (Docket Item Nos. 19, 21.) These motions were granted by the court on August 5, 2008. (Docket Item No. 28.) In the meantime, on August 4, 2008, the court granted the preliminary injunction, ordering the Secretary to issue a cessation order. (Docket Item No. 23.)

On August 5, 2008, MFP and Penn Virginia filed motions to dissolve the preliminary injunction. (Docket Item Nos. 33, 34.) MFP and Penn Virginia also filed motions to dismiss on August 5, 2008. (Docket Item Nos. 30, 32.) The court held a hearing on the motions to dissolve on August 7-8, 2008. Following the hearing, the plaintiffs filed a motion to file an amended complaint. (Docket Item No. 51.) On

-2-

August 14, 2008, the plaintiffs filed a motion for summary judgment, (Docket Item No. 52), and on August 29, 2008, the Secretary of the Interior filed a motion to dismiss or, in the alternative, a motion for summary judgment. (Docket Item No. 70.)

Following the August 7-8, 2008, hearing, the parties submitted the case to the court not only on the motions to dissolve the preliminary injunction, but also on the parties' cross-motions for summary judgment. By Order dated August 15, 2008, the undersigned denied the motions to dissolve the preliminary injunction. (Docket Item No. 56.) By Order dated September 10, 2008, the court granted the plaintiffs' motion to file an amended complaint. (Docket Item No. 78.)[1] The court further ordered that the defendants' pending motions to dismiss and motions for summary judgment would be treated as being filed in response to the Amended Complaint.

Based on the evidence, representations and arguments submitted to the court, the undersigned now submits the following report and recommended disposition on the defendants' motions to dismiss and the parties' cross-motions for summary judgment.

## II. Facts

The Sierra Club is a national nonprofit corporation dedicated to exploring, enjoying and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting

---

[1]The Amended Complaint included a specific request that the court issue a permanent injunction.

Case 2:08-cv-00036-GMW-PMS   Document 82   Filed 10/15/08   Page 3 of 39   Pageid#: 1054

humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Gary D. Bowman, Carl Ramey and Kathy Selvage are members of the Sierra Club. SAMS is a nonstock membership corporation based in Appalachia, Virginia. Ramey is the president of SAMS, and Bowman and Selvage are members.

On or about February 21, 2007, A&G Coal Corporation, ("A&G"), filed Permit Application No. 1003841 with DMME. That application remained pending as of August 7-8, 2008, the dates the court heard the defendants' motions to dissolve the preliminary injunction issued by the court on August 4, 2008. In a sworn permit application, A&G asserted that it had the right to enter and conduct surface coal mining operations on the proposed permit area pursuant to a lease with Penn Virginia dated December 29, 2003. A&G's permit application, in its General Operation Plan, identified "clearing and grubbing" as operations that A&G proposes to conduct under the requested permit to facilitate coal extraction. The General Operation Plan also states: "Economically harvestable timber will be removed as a separate operation." The General Operation Plan also states: "The premining land use of the site is unmanaged forest land...." On or about June 16, 2008, Penn Virginia entered into a contract with MFP to remove vegetation, including harvestable timber, from at least part of the permit area that A&G defined in Permit Application No. 1003841.

In an affidavit dated July 19, 2008, Bowman stated that early on the morning of July 11, 2008, Bowman, who lives in the Ison Rock Ridge area of Wise County, Virginia, which is the subject of A&G's Permit Application No. 1003841, heard machinery operating directly behind his house. Bowman discovered MFP employees

cutting and clearing the forest within 20 feet of his property line, using a bulldozer, two cutters and two haulers. Bowman alleges that he received no advance notice of these operations. The following day, Bowman found that more than a dozen large rocks the size of watermelons had fallen onto his property from the area of MFP's operations. MFP employees subsequently removed the rocks from Bowman's yard and threw them into the weeds outside of his property line. Subsequent to that time, MFP has bulldozed a road across the ridge behind Bowman's house and has piled dirt and brush along the steep downslope side. Bowman alleges that MFP is not selectively cutting down and removing only commercially viable timber, but is clear-cutting the area, hauling some trees out, while leaving other felled trees and brush in piles on the ground. The haul road that MFP is constructing is approximately 60 feet above Bowman's home on an extremely steep incline. While MFP has left in place a 20-foot tree barrier between its operations and Bowman's property, Bowman is skeptical that such a barrier will prevent rock slides that might severely injure or even kill him, his wife or his dogs. On July 18, 2008, MFP began clear-cutting higher up on Ison Rock Ridge, causing Bowman even greater concern for his family's safety because any rocks or other debris falling from higher up on the steep slope will fall a greater distance and pick up greater speed. Bowman further fears that MFP's operations will damage his garden and the watershed in which his property lies. Bowman stated in his affidavit that part of the produce from his garden is used by his own family, part is sold to a local farmers market and part is donated to charity.

On July 21, 2008, Sierra Club and SAMS, on behalf of Bowman and other of its members, filed a request for federal inspection and enforcement with the Secretary at the Big Stone Gap, Virginia, Area Office of the Office of Surface Mining

Reclamation and Enforcement, ("OSM"). The request alleged that MFP was conducting surface mining related activities on Ison Rock Ridge on behalf of A&G. Because OSM considered the allegations to constitute an imminent danger to the health and safety of the public, OSM promptly ordered and conducted a federal inspection of the property, accompanied by representatives of the Virginia Division of Mined Land Reclamation, ("DMLR"), on that same day. By letter dated July 24, 2008, Walt Wieder, a surface mining reclamation inspector for OSM in Big Stone Gap, Virginia, informed the plaintiffs that OSM would not take any enforcement action because it had "determined that the alleged disturbances are related to logging and are not being conducted[] by or on behalf of, a coal mining operation."

Wieder also testified at the August 7-8, 2008, hearing on the motions to dissolve the preliminary injunction. Wieder stated that, as an OSM inspector, he mostly performed oversight and inspections with the state DMLR inspectors on surface mines. Wieder testified that because Virginia is a primacy state, meaning that Virginia's surface mining program has been accepted by OSM as the regulatory authority for enforcement of the SMCRA in Virginia, his office conducted oversight instead of direct inspections. Wieder testified that DMLR officials issued surface mining permits and were the primary inspectors and regulators of violations in Virginia.

Wieder testified that his office received a citizen complaint on July 21, 2008, regarding the Ison Rock Ridge property, requesting a federal inspection of the area. Wieder stated that his office conducted a joint inspection with DMLR on the same day. He stated that he personally went to the Bowman residence, looked at the back

-6-

yard and was shown some large rocks in the weeds at the back edge of the yard at the base of a steep hillside. He further stated that there was a disturbance on up the hillside that appeared to be possible road building. Wieder testified that the distance from Bowman's house to the edge of the steep slope was 100 feet and that from the edge of the slope to the row of disturbed vegetation, just below the road, was 100 feet. Thus, Wieder stated that the road was approximately 200 feet from Bowman's house. Wieder testified that when he went up on the site to investigate the origin of the rocks and the disturbance, the inspectors found a skid road where some timbering had begun and that the rocks had come from cutting the skid road into the steep hillside. Wieder testified that the distance from the Bowman house to A&G's proposed surface mining permit area was 300 feet. He further testified that the skid road was more than 50 feet outside of the proposed permit area.

Wieder testified that the road being used to haul logs off of the mountain appeared to line up fairly closely with a coal haul road included in A&G's permit application. He stated that he did not know how long that road had been there, but that there had been previous mining in the area. Wieder testified that, as part of the joint inspection, it was determined that MFP, through its subcontractor, Timberline Logging, ("Timberline"), was conducting the timbering operation. He stated that the inspection revealed no connection between A&G and the logging operation. He further stated that, after contacting several individuals, it was determined that the activity was not surface coal mining. He stated that what he observed appeared to be a typical clear-cut logging operation.

As a result of his inspection, Wieder completed an OSM Mine Site Evalution

form on July 23, 2008. Wieder explained that he designated the site as "AN" on this form, meaning "active nonproducing," because he felt it was the best fit under the circumstances. However, after further questioning by the court, Wieder admitted that "ND," meaning "no disturbance, no coal mining and reclamation operations have been started," would have been a better fit.

Wieder testified that if a surface coal mining permit had been issued for this property, the activities occurring might have qualified for surface coal mining operations, if the specific area was bonded. He further testified that if the investigation had revealed the same activities, but that the activities were being done by A&G or that A&G had hired them to be done, he would have found that they were surface coal mining operations. Wieder stated that one of the primary things the inspectors were looking for was whether A&G was involved in the operations that were occurring on the site. Wieder testified that in determining whether activities constitute surface coal mining operations, factors to be considered include who is conducting the disturbance, what equipment being used, what is actually being done on the ground in terms of clearing and whether coal has been exposed and picked up and transported. He further stated that other activities occurring on the proposed permit area must be considered, particularly oil and gas activities. Specifically, he stated that there was a gas line along the Kelly coal bench where the permit perimeter markers had been set up.

Wieder testified that he did not know that, under the lease, Penn Virginia and A&G were required to coordinate surface development. He further stated that he did not know that A&G was required to submit to Penn Virginia all of its permit

-8-

applications and permit application revisions. Finally, Wieder stated that he was unaware that A&G was required to notify Penn Virginia of the intent to file a permit application. However, Wieder testified that when a coal surface mining permit is applied for, the surface owner is automatically notified. Specifically, Wieder stated that the notices of pending applications also are published in a local newspaper.

Mike Giles, an area supervisor for DMME, also testified at the August 7-8, 2008, hearing. Giles stated that he was responsible for the supervision of 11 enforcement inspectors in the Lee County and Wise County, Virginia, area. He stated that his office had received calls from Bowman regarding the Ison Rock Ridge application, but that Bowman had not filed a formal complaint with DMME. Giles stated that Bowman called his office in July 2008 after hearing a bulldozer operating behind his house. Giles stated that he sent an inspector to the site the next morning and it was determined that logging operations were occurring. He testified that, thereafter, OSM forwarded a copy of the July 21, 2008, citizen complaint to him. Giles stated that, typically, OSM would forward a complaint to DMME with a 10-day notice, during which time DMME would investigate and report its findings back to OSM. He stated that, in this case, OSM waived the 10-day notice period and, instead, conducted an immediate inspection accompanied by the DMME inspector.

Giles stated that as part of his investigation he obtained an outline of A&G's proposed permit boundary, as well as the logging lease. He then had the appropriate individuals at DMME digitize the boundary of the logging operation so that the permit boundary could be overlaid upon it. Giles testified that this showed that part of the logging area was outside of the proposed permit area. Giles testified that DMME

-9-

determined that it was a logging operation. He stated that he also returned to the site during the week prior to the hearing.

Giles testified that he had received a prior complaint in June 2007 from Kathy Selvage that mining had begun on A&G's proposed permit area. An investigation revealed logging operations that had been completed. Giles stated that there were gas well operations on the proposed permit area, but no surface coal mining activities. He testified that OSM did not get involved in that investigation.

Giles stated that in determining whether a haul road is connected with surface coal mining, it is vital to determine whether the road is being used to facilitate surface coal mining. He testified that oil and gas operations existed in the Ison Rock Ridge area and that the haul road observed being used for logging activities had been there for at least 30 years. He stated that the oil and gas facilities were accessed using this haul road. Giles testified that oil and gas had the haul road permitted, but if surface mining operations began, DMLR would assume the primary enforcement role due to more stringent requirements. Giles stated that when he went to the property the week prior to the hearing, he observed that the use of some gas lines had been discontinued in preparation for surface mining. Giles testified that MFP had somewhat improved the haul road. He stated that the improvements appeared to be in connection with the logging operation, not to enhance coal mining.

Giles testified that timber operations in Virginia are regulated by the Virginia Department of Forestry. Giles stated that he helped negotiate a guidance document that was adopted in 2002 among DMME, DMLR and the Virginia Department of

Forestry to help with coordination of activities to avoid duplication of enforcement efforts and confusion with regard to areas permitted for mining. Giles testified that, to his knowledge, the guidance document had not been submitted to the Secretary of the Interior for approval and inclusion in the Virginia surface mining regulatory program. He stated that boundaries of pending permit applications are placed on a topographical map which is made available to the Virginia Department of Forestry so it is aware of the pending permit application on a certain area. Giles testified that, in determining whether tree removal is in connection with mining, DMME looks at the landowner's overall timber management plan, how the areas proposed for logging coincide with the boundaries of a permit application and the type of land disturbance. Specifically, Giles testified that with a timbering operation, there would be skidders and small bulldozers, whereas with a surface mining operation, there would be large earth moving equipment. He further stated that with timbering operations, there would be road cuts and log landings. Giles also testified that timbering operations usually did not include grubbing, which means the removal of all vegetation, including tree stumps.

Ian Dye, Area Office Manager for OSM's Big Stone Gap, Virginia, area office, also testified at the August 7-8, 2008, hearing. He stated that he received a complaint from plaintiffs' counsel on July 21, 2008, which he referred to the state. He stated that when the state officials called and asked if he wanted to go with them later that day to inspect the property, he sent Walt Wieder, whom he supervised. Dye testified that he made several phone calls to his counterparts in the surrounding states inquiring whether they knew of any case law governing logging in the context of surface coal mining. He stated that he contacted the Virginia Department of Forestry to see

whether it had been notified of the logging operation, and he was informed that it had. Dye testified that Russell Proctor, with the Virginia Department of Forestry, informed him that he had investigated a complaint by Bowman several days previously. Dye testified that he was in constant contact with the state, swapping information, during the investigation. He further testified that he was informed by Joe Powers with Penn Virginia that the timbering operation was part of its forest management plan and that Penn Virginia had a lease with MFP. Dye testified that he did not speak with anyone with A&G. Dye testified that there was no clearing and grubbing being conducted and that skid roads were constructed. He testified that there was timber left on the ground that a coal company normally would have disposed of if it was preparing for mining. He stated that OSM ultimately determined that there were no surface coal mining operations being conducted.

Dye testified that over the course of his career he had to investigate whether certain operations constituted coal mining. He stated that the relevant factors in such circumstances included whether a coal company or coal-related entity was conducting the operations. Dye testified that he checked with his Kentucky and Tennessee counterparts who informed him that they knew of no regulations that would tie timbering to surface coal mining if the timbering operation was truly an independent operation. Dye testified that his office continued to gather evidence in the matter even after the July 23, 2008, inspection report was issued. Specifically, he stated that he had several conversations with Penn Virginia and with A&G's consultant. In addition, Dye testified that OSM obtained excerpts of the lease. Moreover, Dye stated that Wieder returned to the site. However, Dye testified that OSM had not changed its conclusion that the timbering operation did not constitute surface coal mining

operations.  Dye testified that his conclusion probably would have been different had MFP's contract been with A&G because it would have been in connection with A&G's operation.  Dye further testified that his conclusion would have been different had the permit already been issued and MFP was conducting a timbering operation outside of the terms and conditions of the permit.  Dye testified that he was not specifically aware that the guidance document required DMME to notify the Department of Forestry of every permit application, but that would not surprise him.

Jim Meacham, a reclamation area supervisor with DMME, also testified at the August 7-8, 2008, hearing. He stated that, under the Virginia surface mining regulations, a permit applicant had to get right of entry from the landowner, give notice to municipalities if mining was going to occur in those areas and allow for an opportunity to comment on the permit application.  He further testified that other utilities, such as gas companies and power companies, had to be notified if such existed on the property and that  some surrounding landowners had to be notified. Meacham testified that some of the factors relevant to determining whether logging operations are in connection with surface coal mining include determining whether the Department of Forestry has received notice of the logging operation, whether a coal company or entity related to a coal company is conducting the logging operation, whether the logging is being conducted under a forest management plan and what activities are occurring on the ground.

Meacham testified that the guidance document made it easier when determining jurisdiction when logging was involved. He testified that the guidance document stated that if a timber harvesting operation occurred in a permitted area, on an area that

-13-

was going to facilitate mining, DMLR would regulate it. Meacham testified that prior to the issuance of a permit, any commercial timbering on a proposed permit area is overseen by the Department of Forestry, not DMLR. Meacham testified that the guidance document had not been approved by the Secretary of the Interior to be included as part of the Virginia surface mining regulatory program. Thus, he stated that the guidance document could not limit in any way the definition of surface coal mining operations under the approved Virginia program.

Larry Jackson, Manager of Timber Operations for Penn Virginia properties located in West Virginia, Virginia and Kentucky, testified that he signed a June 16, 2008, timber sale agreement, covering approximately 224 acres, between Penn Virginia and MFP. He stated that Donnie Harber, an employee of MFP, initiated discussions with him about timbering the land at issue, informing him that there was commercially viable timber on the land and that MFP had a logger, Timberline, in that area that had finished its then-current logging operation. Jackson testified that Penn Virginia entered into the timber sale agreement for profit and to manage its timber properties. He testified that the agreement called for clear-cutting of all of the trees, which meant that all of the trees would be removed down to stumps of a height of five inches or less. He testified that the stumps left behind from clear-cutting remained alive, would resprout into new trees and would ultimately lead to reforestation. Jackson stated that clear-cutting allowed for an even-aged timber stand management that would create a faster growing, healthier timber stand. Jackson testified that Penn Virginia had entered into other timber sale agreements with MFP in 2003 and 2006, and that the June 16, 2008, timber sale agreement was no different from the previous agreements. He testified that, at the time Penn Virginia and MFP entered into the

-14-

timber sale agreement, he had no knowledge that a surface coal mining permit application was pending on part of the land covered by the agreement. In fact, Jackson stated that he did not even know whether there was any coal on the property subject to the agreement, nor was he aware of the mining plans of any Penn Virginia lessee. He further testified that he would become aware of such only when a coal mining permit was actually issued, at which time someone in Penn Virginia's engineering department might inform him if timber was present in that area so that it could be harvested.

Jackson testified that the boundaries of the area to be timbered were formulated by Harber based on the location of commercially harvestable timber. He further testified that of the 224 acres subject to the timber sale agreement, 151 acres also were within the area for which the surface coal mining permit was being sought. Thus, 73 acres of land subject to the timber sale agreement was outside of the boundaries of the land subject to the proposed surface coal mining permit application. Jackson also testified that 117 acres of the 224 acres was not within the area containing the Kelly coal outcrop, the only coal outcrop on the proposed permit area.

Jackson testified that Penn Virginia properties produced approximately 4 to 5 million feet of timber annually. He estimated that the value of the timber subject to the timber sale agreement at issue would be between $80,000 and $90,000. He stated that following the clear-cutting by MFP, the property subject to the timber sale agreement would reforest and be put back into Penn Virginia's timber properties. He testified that even if the property was ultimately surface mined, it would be reclaimed and planted with trees. Moreover, Jackson reiterated that even if the area was mined,

73 acres were outside of the proposed permit area and would not be affected, and 117 acres had no coal underneath it to be mined.

Jackson testified that MFP was not part of Penn Virginia, but was a completely separate, independently owned and operated company. He testified that the area closest to the Bowman house was outside of A&G's proposed permit area. Jackson stated that he was unaware of any interaction between Penn Virginia and A&G in coordinating the timber operations. He stated that he did not interact with A&G and had no knowledge of any of their operations. Jackson testified that, under the timber sale agreement, MFP would pay Penn Virginia for the timber harvested thereunder. He stated that he had not seen the lease between Penn Virginia and A&G, nor did he know what rights A&G had under the lease.

William Shupe, Property Manager for A&G, also testified at the August 7-8, 2008, hearing. Shupe stated that he handled A&G's leases, issues regarding utilities on properties, coal exploration and acquisition of new properties. Shupe testified that Penn Virginia originally entered into the coal mining lease at issue with Meg-Lynn Land Company, ("Meg-Lynn"), but that in 2003, A&G acquired Meg-Lynn and that all of the rights under the lease were assigned to A&G at that time. He testified that A&G was a totally separate, independent company from MFP. Shupe further testified that A&G had no contract with MFP for removal of timber on the proposed permit area. He stated that, under the lease, Penn Virginia retained the right to timber the property subject to the coal mining lease, and that, therefore, A&G would not harvest and sell any timber should the pending permit application be granted. However, Shupe testified that should the permit be issued, and should there be trees on the

-16-

property, A&G could remove the timber if Penn Virginia did not want it. He stated that A&G would notify Penn Virginia in the event that a permit application was approved. Shupe stated that Penn Virginia had never contacted him to say that it was going to timber the area because A&G planned to mine it. Shupe also testified that A&G would have to clear the property and engage in grubbing, meaning the removal of all vegetation, including stumps, stems, dead wood, live trees and bushes. Shupe testified that A&G used a contractor, Lynch Construction Company, to perform grubbing work. He testified that grubbing could not be performed a year prior to the beginning of mining because the vegetation would grow back. He further testified that the practice of clear-cutting hindered this grubbing process because the small bulldozers used for grubbing would have difficulty removing the stumps left behind by clear-cutting. Instead, Shupe stated that it was easier to push the trees over when there was more tree existing above the ground.

Shupe clarified that, while there were other coal seams on the property, the Kelly coal seam was the only area to be mined on the proposed permit area. He testified that A&G's surface coal mining application for a permit to surface mine on this property was filed in early 2007. Shupe testified that, should the permit be granted, A&G would have to operate in compliance with the operation plan filed in connection with the permit application. He stated that A&G and Penn Virginia did not cooperate and coordinate the logging and road building conducted on the proposed permit area. Shupe further stated that he did not know whether A&G submitted its original and revised permit applications to Penn Virginia for approval. He also testified that he did not know whether A&G notified Penn Virginia of its intent to permit the area, although the lease required that such notice be given. Shupe testified

-17-

that A&G, as the lessee, was required under the lease, to indemnify Penn Virginia for any damages that Penn Virginia might suffer as a result of violations of the SMCRA during the term of the lease.

Steven Looney, Vice President of Operations for Penn Virginia, also testified at the August 7-8, 2008, hearing. Looney testified that when A&G acquired Meg-Lynn in 2003, he personally renegotiated the lease to change only the term of the lease and royalty payment issues. He stated that all other provisions remained in effect. Looney testified that there had been timbering and road building on the proposed permit area "[g]oing back several years," and continuing until this court issued the cessation order. Looney testified that 151 acres of the 224 acres included in the timber sale agreement were within the proposed permit area as well. He stated that the removal of trees and other vegetation was required by law before A&G could mine the proposed area. He stated that Penn Virginia did not cooperate and coordinate the recent logging operation by MFP with A&G. Looney testified that Penn Virginia had periodic meetings with A&G to discuss their mining intentions and their operations. He testified that the primary reason for a clause in the lease referencing cooperation and coordination between Penn Virginia and A&G was not relevant to timbering operations because it was Penn Virginia's property. Looney testified that the clause was included in the lease so that, in the event that a permit was issued, Penn Virginia would notify A&G in advance of timbering on the permitted site so that A&G would not be in violation of the SMCRA. Looney stated that A&G was aware that Penn Virginia had timbering operations throughout the proposed permit area, and Penn Virginia was aware that A&G had mining operations.

Looney stated that while he believed that A&G informed Penn Virginia that it was filing a permit application, A&G did not submit the actual permit to Penn Virginia. Looney testified that the purpose of such notice was to determine whether such a permit would overlap other permits and would interfere with other operations of Penn Virginia. He stated that Penn Virginia had other leases on the property, including with gas companies, with timber companies and for deep mining. Looney testified that the lease required A&G to indemnify Penn Virginia for any violations of the SMCRA that may occur during the lease term. He stated that if no permit has been issued, there is no need to coordinate the removal of timber from the proposed permit area with A&G. However, Looney testified that if A&G notified Penn Virginia that the surface coal mining permit was issued, and if there was standing harvestable timber on the property, Penn Virginia would coordinate with A&G to remove any "harm's way" timber at least six months in advance of the mining. Looney defined "harm's way" timber as commercial timber that could be lost due to the mining activities. Looney stated that if a permit was issued, and if Penn Virginia removed the harvestable timber, then Penn Virginia would be bound by the terms of the permit to conduct its operations in compliance with the permit and surface mining regulations. He stated that MFP would have to comply because it was required to do so by the timber sales agreement.

Gregory Gambrel, Senior Procurement Forester for MFP, also testified at the August 7-8, 2008, hearing. He stated that he managed day-to-day raw materials supply and product sales activities. Gambrel testified that Penn Virginia had no ownership or control over MFP. He further stated that MFP had no relationship with A&G of which he was aware. He stated that A&G did not direct or control any of

-19-

MFP's activities on the property. In fact, Gambrel stated that he did not know of any contact between MFP and A&G, aside from MFP obtaining a copy of A&G's permit map at some point during the harvesting of the timber. He testified that MFP obtained this map to facilitate the logging operation because, typically, coal companies made very good topographical maps. Gambrel testified that MFP was unaware that A&G had requested a permit for surface coal mining on the property at the time it entered into the timber sale agreement with Penn Virginia. However, he stated that such information was generally immaterial to MFP's timber operations, noting that it was the actual issuance of a permit that was relevant because, at that time, MFP would have to comply with the terms of the permit. Gambrel testified that MFP operated several contract loggers on standing timber properties, noting that its main products were wood chips for the pulp and paper industry and saw logs for the lumber market. Gambrel stated that MFP contracted with Timberline on the property at issue.

Gambrel testified that he had seen a photo revised copy of a United States Geological Survey topographical map dating from approximately the mid-1970s which showed at least a portion of the haul road which was observed being used for the recent logging activities. Gambrel testified that the timber sale contract with Penn Virginia was for a term of one year and was a "pay as you cut" contract. He stated that clear-cutting was typically used to regenerate stands of timber, and he noted that most species of trees responded by sprouting from the stump, which gave them advanced regeneration capabilities over seed, allowing for the establishment of a new stand of timber in a very short amount of time. Gambrel testified that after MFP left this job, all existing stumps and uncut trees would remain. He stated that if these were left undisturbed, they would regenerate into a forest. Gambrel testified that other than

-20-

where a road or landing was placed, the soil or vegetation would be only minimally disturbed by logging.

Gambrel testified that MFP had operated other jobs in the same area for Penn Virginia. He stated that the timber operation occurring on the hillside above Bowman's house was outside of A&G's proposed surface mining permit boundary. He estimated that the slope behind Bowman's home was approximately 40 percent, but noted that it was concave so that the steepness came down below the road and leveled out into a wooded buffer. Gambrel stated that MFP had received the Secretary's cessation order, but that there was some timber remaining that was outside of the permit area. Given Timberline's production capabilities, he estimated that five to seven days' worth of work remained to be done from the date of the cessation order. Gambrel testified that 60 to 70 acres of commercial timber remained within the permit area as well. He stated that the heart of the 224-acre timber operation consisted of approximately 110 acres. He estimated that approximately 75 to 80 percent of this timber would be used for pulp wood, while the remaining approximately 25 percent would be used for saw logs. Gambrel estimated that MFP would pay Penn Virginia approximately $60,000 to $75,000 for the timber that remained on the property. However, he estimated that the money generated from the removal and sale of these products could generate upwards of $200,000 to $250,000. He stated that he did not know how much profit MFP stood to make on the remaining timber. Gambrel testified that, if the permit was issued and development began on the mine, MFP would be precluded from accessing the remaining timber.

Gambrel stated that if Timberline had to leave the area, it would incur

-21-

significant moving costs, including needing multiple trucks and multiple trailers to move its equipment. Gambrel further testified that Timberline's productivity already had been severely impacted due to the cessation order, in that it had already had to move once off of the proposed permit area, causing lost production. He stated that the movement would take at least a day, thereby resulting in more lost production in the middle of a week. Gambrel testified that Timberline typically planned its moves during times it could not produce, such as after close of business and on weekends, so that the impact on production was minimal. While Gambrel could not supply the court with a specific number, he stated that moving costs alone would be several thousand dollars. He further stated that lost profits from deliveries could be as much as $12,000 to $14,000 daily. He further testified that he could not say whether MFP would even want to complete the contract if the injunction remained in force.

Gambrel testified that the timber remaining within A&G's proposed permit area was more than one-half mile from Bowman's home. Given the topography, Gambrel said it would be physically impossible for the logging of this remaining timber to impact Bowman's home because Bowman's home and the remaining timber were separated by at least one ridge. Gambrel testified that MFP had completed all timbering operations in the area around Bowman's home and that the area already had been reclaimed by the establishment of water diversion devices and seeding to stabilize the soil. He stated that MFP had no plans to go back into that area for any timber removal or road building operations. He stated that there remained loose rocks, dirt and remnants of vegetation on the property above Bowman's home. Gambrel testified that, if the court lifted the cessation order, it would take approximately one month to five weeks to finish the timbering operation. Gambrel further testified that

-22-

there were three residences downhill from the remaining tract of timber, and he noted that this slope was a much more severe slope than the one behind the Bowman residence, further noting that MFP might not even operate in that area given the difficulty of the operation. Gambrel noted potential safety concerns for his employees and residents.

Karl Kinding, one of the owners and the Secretary of MFP, also testified at the August 7-8, 2008, hearing. Kindig stated that he was involved in the day-to-day management of the company. He testified that MFP was in no way associated through ownership or control with Penn Virginia or A&G, stating that the timber sale agreement was a completely arms-length transaction. Kindig testified that there was nothing about the timber sale agreement that was intended to facilitate mining. He stated that MFP had a contractor that was working out of another location in the area, and Harber suggested to Penn Virginia that it would be a good place for MFP's contractor to go. Kindig testified that, in his experience, such a logging operation had never been considered to be a surface coal mining operation. Kindig testified that he became aware that the timber operation was being conducted partly on the proposed permit area only when the current lawsuit was filed.

### III. Analysis

The SMCRA was enacted by Congress "to protect society and the environment from the adverse effects of surface coal mining operations" and to "assure that the rights of surface landowners ... are fully protected from such operations." 30 U.S.C.A. § 1202(a), (b) (West 2007). Under the SMCRA, the term "surface coal mining

-23-

operations" is defined, in relevant part, as follows:

> activities conducted on the surface of lands in connection with a surface coal mine ... the products of which enter commerce or the operations of which directly or indirectly affect interstate commerce.

30 U.S.C.A. § 1291(28)(A) (West 2007). Further, pursuant to 30 U.S.C. § 1256(a), "no person shall engage in or carry out on lands within a State any surface coal mining operations unless such person has first obtained a permit issued by such State pursuant to an approved State program or by the Secretary pursuant to a Federal program. ..." 30 U.S.C.A. § 1256(a) (West 2007).

The plaintiffs in this case have filed this suit pursuant to 30 U.S.C. § 1270 of the SMCRA seeking an order compelling the Secretary to issue a cessation order requiring Penn Virginia, MFP and any others acting in concert with them to cease conducting "surface coal mining operations" within the proposed boundaries delineated in Permit Application No. 1003841. *See* 30 U.S.C.A. §1270(a) (West 2007). Title 30 U.S.C. § 1270 allows for "citizens suits" under the SMCRA. That section states that "any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this chapter ... against the Secretary ... to the extent permitted by the eleventh amendment to the Constitution where there is alleged a failure of the Secretary ... to perform any act or duty under this chapter which is not discretionary with the Secretary . ..." 30 U.S.C.A. § 1270(a)(2) (West 2007). This same section states that no such action may be commenced prior to 60 days after the plaintiff has given notice in writing of such action to the Secretary, except in the case where the violation complained of constitutes an imminent threat to the health or safety of the plaintiff or

-24-

would immediately affect a legal interest of the plaintiff. *See* 30 U.S.C.A. § 1270(b)(2) (West 2007).

Pursuant to 30 U.S.C. § 1271(a)(2), when, on the basis of a federal inspection, the Secretary or his authorized representative determines that any condition or practice exists, or that any permittee is in violation of any requirement of the SMCRA or any permit condition required by the SMCRA, which condition, practice or violation also creates an imminent danger to the health or safety of the public, or is causing, or can reasonably be expected to cause, significant, imminent environmental harm to land, air or water resources, the Secretary or his authorized representative shall immediately order a cessation of surface coal mining and reclamation operations or the portions thereof relevant to the condition, practice or violation. *See* 30 U.S.C.A. § 1271(a)(2) (West 2007). Furthermore, the Secretary's own regulations state:

> Surface coal mining operations conducted by any person without a valid surface coal mining permit constitute a condition or practice which causes or can reasonably be expected to cause significant imminent environmental harm to land, air, or water resources. ...

30 C.F.R. § 843.11(a)(2) (2007).

Based on the above, the parties agree that the Secretary has a nondiscretionary duty to issue a cessation order if, based on a federal inspection, the Secretary or his authorized representatives determine that surface coal mining operations are being conducted without a valid permit. *See* 30 U.S.C.A. § 1271(a)(2). Both sides also agree that a surface coal mining permit application for this property is currently pending before DMME and that no permit for surface coal mining operations has been

-25-

issued with regard to this property. The plaintiffs argue that the activities complained of are "surface coal mining operations" within the meaning of the SMCRA. If that be the case, the plaintiffs argue, the Secretary has a nondiscretionary duty to issue a cessation order and this nondiscretionary duty is enforceable by this court under 30 U.S.C. § 1270(a)(2). The defendants, on the other hand, argue that the Secretary properly determined that the activities complained of are not "surface coal mining operations" within the meaning of the SMCRA. If that be the case, the defendants argue, the Secretary has no duty to issue a cessation order and this court lacks jurisdiction to compel the Secretary to do so.

In particular, MFP and Penn Virginia argue that, under the SMCRA, once a state's surface mining regulatory program has been approved by the Secretary, as Virginia's has been, the state becomes a "primacy" state and assumes exclusive jurisdiction over the regulation of surface coal mining within its borders. *See* 30 U.S.C.A. § 1253(a) (West 2007); 30 C.F.R. §946.10(2007). Thus, they argue that the issue before this court – whether MFP's activities on this land are "coal surface mining operations" – is a matter of Virginia, not federal, law. If that be the case, they argue that the determination of whether MFP's activities on this land are "coal surface mining operations" should be made by state regulatory officials, not a federal court.

The Fourth Circuit has held that the provision of the SMCRA giving a state exclusive regulatory jurisdiction "does not encompass exclusive adjudicatory jurisdiction." *See Molinary v. Powell Mountain Coal Co., Inc.* 125 F.3d 231, 236 (4th Cir. 1997). In particular, the Fourth Circuit in *Molinary* held that, under 30 U.S.C. § 1270(f), federal courts had jurisdiction to hear "citizens suits" for damages filed

-26-

against surface mine operators for violations of state regulatory programs. *See* 125 F.3d at 236-37. The Fourth Circuit has held, however, that the Eleventh Amendment to the U.S. Constitution bars citizens suits in federal court to compel a state official to act in accordance with state law. *See Bragg v. W. Va. Coal Ass'n,* 248 F.3d 275, 293-98 (4th Cir. 2001). In response to a similar jurisdictional argument in *Bragg*, the Fourth Circuit recognized that 30 U.S.C. § 1270 gave the district courts jurisdiction to hear disputes regarding the Secretary's nondiscretionary duties under the SMCRA. *See* 248 F.3d at 299. In *Bragg,* the court stated:

> Jurisdiction is proper unless "the cause of action alleged is *so patently without merit* as to justify ... the court's dismissal for want of jurisdiction." ... It may be the case, as the coal companies claim, that further legal analysis would have revealed that the duties alleged were either "discretionary" or not "under this chapter." But that type of argument would be properly raised not in a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, but rather in a Rule 12(b)(6) motion to dismiss for failure to state a claim.

248 F.3d at 299 (citations omitted) (emphasis in original).

The case before this court contains a unique twist in that the plaintiffs have sued to compel the Secretary to act in accordance with federal law in a state which has been given exclusive regulatory jurisdiction. Nonetheless, I find that the court has subject matter jurisdiction over such a case.

Title 30 U.S.C. § 1270 gives the federal district courts jurisdiction over citizens suits brought to compel the Secretary to perform a nondiscretionary duty. *See* 30 U.S.C.A. § 1270(a)(2). Also, § 1271 recognizes that there may be cases, such as this

Case 2:08-cv-00036-GMW-PMS   Document 82   Filed 10/15/08   Page 27 of 39   Pageid#: 1078

one, where the state has assumed exclusive regulatory authority over coal surface mining, but the Secretary steps in to conduct an immediate federal inspection based on a citizen's complaint alleging "an imminent danger of significant environmental harm." *See* 30 U.S.C.A. § 1271(a)(1) (West 2007). Furthermore, the language of 30 U.S.C. § 1253(a) specifically recognizes that a primacy state's "exclusive jurisdiction over the regulation of surface coal mining" does not preclude the Secretary's obligation to inspect and act pursuant to § 1271. *See* 30 U.S.C.A. §1253(a).

It also appears clear under the specific facts of this case that the plaintiffs' recourse is against the Secretary, rather than the state director of DMME or DMLR. The plaintiffs in this case filed their citizens complaint with OSM under the SMCRA. Because OSM considered the allegations contained in the complaint, if true, to constitute an imminent danger to the health and safety of the public, OSM dispensed with the 10-day notification period required by § 1271(a)(1) to give state regulatory authorities time to investigate the alleged violation. *See* 30 U.S.C.A. § 1271(a)(1).[2] Instead, OSM conducted an inspection of the property, and, as a result of its inspection and subsequent investigation, OSM, not DMLR, issued a decision.

Therefore, I recommend that the court deny the motions to dismiss for lack of jurisdiction filed by MFP and Penn Virginia. I will now turn my attention to the merits of the case.

---

[2]Title 30 U.S.C. § 1271(a)(1) requires "adequate proof" that (1) "an imminent danger of significant environmental harm exists" *and* (2) "the State has failed to take appropriate action." 30 U.S.C.A. § 1271(a)(1). Based on Wieder's July 24, 2008, letter, it appears OSM may have intervened in this case upon only an allegation of imminent danger without requiring proof that DMME or DMLR had failed to take appropriate action.

-28-

Since, as stated above, Virginia is a primacy state, Virginia law controls the issue of whether MFP's activities amount to surface coal mining operations. *See* 30 U.S.C.A. §§ 1252, 1253, 1254 (West 2007); *Bragg*, 248 F.3d at 288-89. The Virginia Coal Surface Mining Control And Reclamation Act, ("VSMCRA"), defines "coal surface mining operations"[3] as "[a]ctivities conducted on the surface of lands in connection with a surface coal mine...." VA. CODE ANN. 45.1-229 (2002 Repl. Vol.); *see also* 30 U.S.C.A. § 1291(28). Just as under the federal act, the VSMCRA also states that "no person shall engage in or carry out any coal surface mining operations without having first obtained a permit to engage in the operations issued by the Director, in accordance with the approved state regulatory program." VA. CODE ANN. 45.1-234(A) (2002 Repl. Vol.); *see also* 30 U.S.C.A. § 1256(a). Virginia law also requires each applicant for a coal surface mining permit to submit an "operations plan" as part of its permit application. *See* VA. CODE ANN. 45.1-235(D) (2002 Repl. Vol. & Supp. 2008.). Furthermore, Virginia law states, "The operations ... plans as approved by the Director shall be an integral part of the terms and conditions of the coal surface mining permit." VA. CODE ANN. 45.1-236 (2002 Repl. Vol.).

In this case, A&G has filed a permit application with DMME. Attached to this permit application is its "General Operation Plan." This General Operation Plan states: "Clearing and grubbing operations will be conducted in advance of mining operations. Economically harvestable timber will be removed as a separate operation." The Virginia regulations define "clearing" as "the removal of all standing timber, logs, and

---

[3]While the SMCRA refers to "surface coal mining operations," the VSMCRA refers to "coal surface mining operations." I can determine no difference in the two phrases and will use the two phrases interchangeably, unless referring to the specific language of either a federal or state statute.

brush two inches or greater in diameter." 4 VAC 25-140-170. While not defined in the Virginia regulations, the witnesses before the court explained that "grubbing" meant the removal of all vegetation from the surface. The undisputed evidence also shows that A&G's application for a permit to conduct surface coal mining operations on this property was filed prior to the commencement of MFP's logging activities on the property.

The plaintiffs argue that, because the application was filed prior to the commencement of MFP's logging activities, and because the application seeks permission to clear vegetation and harvestable timber in advance of mining operations, the court should find that the logging activities which have occurred on this property are, as a matter of law, "in connection with" a surface coal mine and, therefore, are surface coal mining operations being conducted without the proper permit. The plaintiffs concede that they may prevail in this action only if the court finds that the logging activities that have occurred on the permit area are "coal surface mining operations" as a matter of law. The plaintiffs further concede that, under 30 U.S.C. § 1270(a)(2), the court may compel the Secretary to act only in the "most clear-cut, non-discretionary obligations." Therefore, if the Secretary had discretion to determine whether these logging activities are "coal surface mining operations," the plaintiffs concede they cannot prevail. Thus, the court must determine whether either the controlling federal or state statutes or regulations require the Secretary to find that the logging activities at issue were "coal surface mining operations."

It is important to note that, under the language of 30 U.S.C. § 1271(a)(2), the Secretary has a nondiscretionary duty to act only when, on the basis of any federal

-30-

inspection, the Secretary or his authorized representative "determines" that a condition exists which creates an imminent danger to the health or safety of the public or is causing, or reasonably can be expected to cause, imminent environmental harm to land, air or water resources. *See* 30 U.S.C.A. § 1271(a)(2). Among the definitions of the word "determine" contained in Webster's II New College Dictionary are "[t]o decide...," "[t]o reach a decision" and "[t]o establish or ascertain definitely, as after consideration, investigation, or calculation." WEBSTER'S II NEW COLLEGE DICTIONARY 309 (Houghton Mifflin Company 2001). Thus, the language of the statute itself appears to give the Secretary the discretion to decide whether a condition exists which would compel him to act.

In this case, the Secretary, through his authorized representatives in the local OSM office, determined that the activities occurring on this property were not "coal mining operations." When reviewing an agency's actions, the court must first determine whether the agency acted within the scope of its authority. *See Kentuckians for Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 439 (4th Cir. 2003) (holding that the analytical approach used to determine the validity of challenged regulations also should be used when a particular agency action is challenged). In determining whether an agency has acted within the scope of its authority, the court must first determine whether Congress has spoken clearly to the issue. *See Kentuckians for Commonwealth*, 317 F.3d at 439 (*citing Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)). If "the intent of Congress is clear" as to "the precise question at issue" ... "that is the end of the matter." *Chevron*, 467 U.S. at 842.

In this case, the SMCRA does not address "the precise question at issue" –

-31-

whether logging occurring on property for which a permit to conduct coal surface mining is pending amounts to "coal surface mining operations." As stated above, the SMCRA defines "surface coal mining operations" as any "activities conducted on the surface of lands in connection with a surface coal mine...." 30 U.S.C.A. § 1291(28). The statute does list a number of specific activities which are "surface coal mining operations," but there is no mention of logging or of clearing the land of vegetation in advance of mining operations. *See* 30 U.S.C.A. § 1291(28).

Since Congress has not spoken on the issue, the court next must determine if the Secretary's own regulations have addressed the issue. The Secretary's regulations also define "surface coal mining operations" as "[a]ctivities conducted on the surface of lands in connection with a surface coal mine." 30 C.F.R. § 700.5 (2007). The regulation also lists a number of specific activities which are "surface coal mining operations," but there is no mention of logging or of clearing the land of vegetation in advance of mining operations. *See* 30 C.F.R. § 700.5. The regulations also define "surface mining activities" as "those surface coal mining and reclamation operations incident to the extraction of coal from the earth by removing the materials over a coal seam, before recovering the coal...." 30 C.F.R. § 701.5 (2007).

The plaintiffs argue that, under this definition, the removal of *any* material overlying a coal seam, after the filing of a permit application, but prior to the recovery of coal, constitutes "surface coal mining operations." Were the court inclined to adopt the plaintiffs' construction of this regulation, once a coal surface mine permit application had been filed, no one could remove any material overlying a coal seam on a permit area until the permit was either granted or rejected. The absurdity of such

a construction is illustrated by the fact that it would prevent mowing grass and discarding the clippings or pruning a tree and discarding the pruned branches while a permit was pending. To the contrary, the language of this regulation is much more narrow than portrayed by the plaintiffs. This regulation does not define "surface mining activities" as *any* activity which removes *any* material overlying a coal seam. Instead, this regulation defines "surface mining activities" to include only "those surface coal mining and reclamation operations incident to the extraction of coal" by removal of the materials overlying the coal. *See* 30 C.F.R. § 701.5.

At the August 1 hearing, the Secretary did concede that, as recognized in the preamble to the federal surface coal mining regulations promulgated in 1979, logging and site preparation "in anticipation of mining" would clearly fall within the definition of "surface coal mining operations." *See* Surface Coal Mining And Reclamation Operations, 44 Fed. Reg. 14902, 14914 (Mar. 13, 1979). The Secretary asserted, however, that the determination was made that the logging activities in this case were not "surface coal mining operations" because the activities were not being conducted "in anticipation of mining" because they were not being conducted by or on behalf of a coal mining operation. The Secretary, nonetheless, has conceded that "the line between site preparation in anticipation of mining coal and independent work is sometimes difficult to draw...." 44 Fed. Reg. at 14914. Because of this difficulty, the Secretary specifically chose not to include "timbering and land-clearing" and "removal of vegetation" in the list of activities included in the definition of "coal surface mining operations" found at 30 C.F.R. § 700.5. Instead, the Secretary reserved the right to make these determinations based on "specific factual situations." 44 Fed. Reg. at 14914. Thus, the Secretary's own regulations do not address whether logging

-33-

occurring on property for which a permit to conduct coal surface mining is pending amounts to "coal surface mining operations."

Since Virginia is a primacy state, the court also must look to see if the Virginia legislature has addressed the issue. As stated above, the VSMCRA contains the identical statutory definition of "coal surface mining operations" as found in the SMCRA. *See* VA. CODE ANN. § 45.1-229; 30 U.S.C.A. § 1291(28). While the Virginia statutory definition of coal surface mining operations includes the same list of specific activities as the SMCRA, it, too, does not include any mention of logging or of clearing the land of vegetation. *See* VA. CODE ANN. § 45.1-229. Furthermore, Virginia's coal surface mine regulations offer no further definition of what activities should be considered coal surface mining operations than the federal regulations do. *See* 4 VAC 25-130-700.5 (state regulatory definitions of "surface coal mining operations" and "surface mining activities" mimic language of federal regulations).

Therefore, contrary to the arguments of the plaintiffs, neither the federal nor the state statutory or regulatory schemes address the issue of whether the activities which have occurred here are "coal surface mining operations." That being the case, the Secretary, through his authorized local representative with OSM, has necessarily been given discretion in determining whether the activities which have occurred here are "coal surface mining operations." Here, the Secretary, through his authorized local representatives with OSM, conducted an investigation and determined that the activities at issue are not "coal surface mining operations." Once that determination was made, the Secretary had no nondiscretionary duty to act.

-34-

Furthermore, when an agency is left to interpret its own regulations, "the agency's interpretation is 'controlling unless plainly erroneous or inconsistent with the regulation.'" *Kentuckians for Commonwealth*, 317 F.3d at 439 (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). This substantial deference to an agency's interpretation of its own regulations is especially applicable when that interpretation is based on the "agency's unique expertise and policymaking prerogatives." *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150-51 (1991) *quoted in Burgin v. Office of Personnel Mgmt.*, 120 F.3d 494, 497 (4th Cir. 1997). In this case, it is difficult to think of an issue that would more involve the OSM's "unique expertise" than determining whether an activity should be considered "surface coal mining operations" under the SMCRA. That being the case, this court must defer to the agency's determination unless it finds that it is "plainly erroneous or inconsistent with the regulation." Based on the facts before the court in this case, I cannot so find.

While the undisputed facts before the court show that A&G has filed an application with DMME seeking a permit to conduct surface coal mining operations on a portion of the property at issue and that this application seeks permission to conduct "[c]learing and grubbing operations" "in advance of mining operations," the undisputed facts also show that the activities at issue in this case were not being conducted by, or at the direction of, A&G. The undisputed evidence before the court shows that the activities at issue were being conducted by Timberline, an independent contractor, at the direction of MFP, who had entered into a timber sales agreement with the landowner, Penn Virginia. While it is true that Penn Virginia knew that it had given A&G the right to surface mine this property prior to entering into the timber

-35-

sales agreement with MFP, there is no evidence before the court that Penn Virginia entered into the timber sales agreement to, in any way, facilitate A&G's proposed surface coal mining operations. To the contrary, it appears that the reason Penn Virginia entered into the timber sales agreement was simply because it presented another opportunity to generate a profit from this property.

Based on the analysis of the regulations as set out above, and the evidence presented in this case, I cannot find that the Secretary's determination is "inconsistent" with the regulations or is "plainly erroneous." That being the case, it would appear that the Secretary had no duty to issue a cessation order under § 1271(a)(2) and the court should lift its preliminary injunction against the Secretary.

As stated above, the plaintiffs, in their post-hearing memorandum, concede that, to prevail in their citizens suit under 30 U.S.C. § 1270(a)(2), they must prove that the Secretary failed to perform a specific nondiscretionary duty imposed upon him by the SMCRA. The plaintiffs, however, have failed to prove that, under the facts and circumstances of this case, the SMCRA imposes a specific nondiscretionary duty on the Secretary. Instead, what the plaintiffs seek from this court is a review of the Secretary's determination that the activities at issue in this case are not "coal surface mining operations." While a review of this determination may properly be presented to this court once the plaintiffs exhaust their administrative remedies, the citizens suit provision of § 1270(a)(2) was not designed to allow a federal court to prematurely intervene to determine whether the Secretary has properly exercised the discretion given to him by the SMCRA and his own regulations.

-36-

It is difficult to imagine any commercial activity that has a more devastating effect on the land than strip mining. As Senior Judge Williams stated in *Ball v. Island Creek Coal Co.*, 722 F. Supp. 1370, 1373 (W.D.Va. 1989): "Strip mining directly removes and thus totally destroys the surface...." The facts before the court in this case, however, clearly show that logging the steep mountains of Southwest Virginia poses many of the same environmental and safety concerns as strip mining. Nonetheless, it is not the role of this court, in this case, to tackle the difficult policy issues raised by the dangers presented to the environment and the occupiers of adjoining lands by logging. Those issues are best left to our federal and state legislators. The court is left only to hope that those issues will be addressed before a child of Appalachia dies beneath a boulder dislodged by logging activities.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations.

1.  The district court has subject matter jurisdiction over this case under 30 U.S.C. § 1270(a)(2);

2.  Neither the federal nor Virginia's statutory or regulatory schemes define "coal surface mining operations" to include the activities at issue in this case;

3.  The Secretary has the discretion to determine whether the activities at issue in this case are "coal surface mining operations;"

4. The Secretary's determination is binding on the court unless it is inconsistent with the regulations or is plainly erroneous;

5. The Secretary's determination that the activities at issue were not "coal surface mining operations" is not inconsistent with the regulations and is not plainly erroneous;

6. The citizens suit provision of 30 U.S.C. § 1270(a)(2) allows a federal court to intervene only when the Secretary fails to act upon a nondiscretionary duty; and

7. The court should deny the plaintiffs' request for entry of a permanent injunction.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny the motions to dismiss, deny the plaintiffs' motion for summary judgment and grant the defendants' motions for summary judgment. Based on the above, the undersigned further recommends that the court vacate the preliminary injunction entered on August 4, 2008.

## Notice To Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636 (b)(1)(C):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation

-38-

to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in the matter to the Honorable Glen M. Williams, Senior United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record.

DATED: This 15th day of October 2008.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE